GANADERÍA ESPERANZA, INC., demandante y recurrente, *v.* ROSARIO MATTEI VDA. DE CASTAÑER y OTROS, demandados y recurridos.

*Número:* R-78-263      *Resuelto:* 9 de febrero de 1979

*M. Martínez Umpierre, D. Emanuelli Hernández,* abogados de la recurrente; *Vivas & Martínez-Texidor,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

Por escritura pública otorgada ante el notario Joaquín Lago Padín, los recurridos, Rosario Mattei Vda. de Castañer, María Irma, Jaime Luis y Alberto Castañer (en adelante "los dueños") cedieron en arrendamiento a la corporación recurrente, Ganadería Esperanza, Inc. (en adelante "la arrendataria"), varias fincas de su propiedad. El arrendamiento se extendería por un plazo de cinco años con derecho la arrendataria de prorrogarlo por cinco años más. Se pactó también que la corporación arrendataria no podría subarrendar ni ceder el contrato sin la autorización expresa y escrita de los arrendadores, con la salvedad de que dicha autorización no sería negada por los dueños irrazonablemente.

Antes de vencer el término original de cinco años—en 7 de diciembre de 1974—la corporación arrendataria le comunicó por escrito a los dueños su intención de ejercer el derecho a la prórroga pactada y solicitándoles a la vez el permiso para subarrendar. Aceptaron los dueños el derecho de la arrendataria a extender el arrendamiento, pero le negaron, sin embargo, autorización al subarriendo. En una primera carta de 17 de enero de 1975 los dueños indicaron como fundamento de su negativa el que el subarrendamiento les era perjudicial a su interés de vender la finca. Luego, en una segunda carta de 15 de febrero de 1975 expresaron que el subarrendamiento les era perjudicial debido a un aumento sustancial en las contribuciones de la propiedad que eran de su cargo. Señalaban que las contribuciones para el año fiscal 73–74 eran $1,064.30, y las de 74–75 fueron aumentadas a $2,512.32. El canon anual de arrendamiento permanecía, sin embargo, en $5,250.00. Los dueños no tenían conocimiento de que antes de la arrendataria solicitar el permiso para subarrendar ya

había llegado a un acuerdo final sobre el arrendamiento de las fincas a un subarrendatario. Desconocían, además, que antes de contestar su petición la arrendataria ya había recibido del subarrendatario un cheque fechado en 31 de diciembre de 1974 por la suma de $7,500 que comprendía cánones de subarrendamiento por adelantado correspondientes a los seis meses que restaban del término original de cinco años pactado en el contrato de arrendamiento. Los cánones bajo el subarrendamiento propuesto resultaban ser a razón de $15,000 anuales mientras que los del contrato original eran a razón de $5,250 anuales para el período de los seis meses en cuestión.

Cuando los dueños vinieron en conocimiento de la formalización del subarriendo, ya habían negado el permiso para subarrendar, por lo que procedieron a notificar a la arrendataria que el contrato quedaba resuelto por incumplimiento con sus condiciones y concediéndole hasta el 30 de junio de 1975, fecha en que expiraba el término original de cinco años, para efectuar la entrega de las fincas.

No satisfecha la arrendataria con la decisión de los dueños de terminar el arrendamiento, acudió al Tribunal Superior, Sala de Arecibo, mediante moción de sentencia declaratoria solicitando se decretara su derecho a subarrendar, por considerar irrazonable la negativa de los dueños. Los dueños contestaron la demanda aceptando prácticamente todas las alegaciones de hechos. Como defensas especiales plantearon los dueños la violación por la arrendataria de la cláusula que prohíbe el subarrendamiento e invocan la que les permite declarar el contrato vencido por cualquier incumplimiento de sus términos, cláusulas o condiciones del mismo. En reconvención separada los dueños alegan, entre otras cosas, que la arrendataria nunca les informó detalle alguno sobre el subarrendamiento, ni siquiera el nombre del subarrendador; que aun antes de solicitar el permiso para subarrendar—en 7 de diciembre de 1974—ya se había efectuado

el contrato de subarrendamiento con el Dr. Antonio Estarella sin previa autorización; y que, en la alternativa, el contrato de subarrendamiento se había efectuado antes de que los dueños hubieran contestado la solicitud de autorización para ello.

## I

El tribunal sentenciador acogió la posición de los dueños al resolver que el incumplimiento del contrato de arrendamiento por la arrendataria permitía a los dueños a dar el mismo por resuelto. Al acudir la arrendataria ante nos en revisión, una sala integrada por tres jueces de este Tribunal se negó a revisar la extensa y bien fundamentada sentencia del tribunal de instancia. Por los fundamentos expresados a continuación sostenemos la decisión de la sala de este Tribunal de 3 de agosto pasado, que tuvo el efecto de confirmar la sentencia del tribunal recurrido que decreta la resolución del contrato.

■ El Código Civil en su Art. 1440, 31 L.P.R.A. sec. 4035, señala que "[c]uando en el contrato de arrendamiento de cosas no se prohíba expresamente, podrá el arrendatario subarrendar en todo o en parte la cosa arrendada, sin perjuicio de su responsabilidad al cumplimiento del contrato para con el arrendador." Las partes en el contrato de autos optaron por acogerse a la prohibición expresa. Así, la cláusula décimotercera del contrato dispone:

"La corporación ARRENDATARIA no podrá subarrendar ni ceder este contrato parcial o totalmente sin la autorización expresa y por escrito de los DUEÑOS, cuya autorización no será negada irrazonablemente, y seguirá siendo responsable del pago de cánones y demás obligaciones de este contrato."

A pesar de la prohibición expresa la arrendataria se adelantó a subarrendar sin el consentimiento de los dueños incumpliendo así una condición importante del contrato. Sobre el incumplimiento desfiló prueba abundante ante el tribunal

sentenciador. El propio subarrendatario Dr. Antonio Estarella Román fue testigo de los dueños. El Dr. Julio A. Santos, Presidente de la corporación arrendataria, y el Sr. Ramón García Villamil prestaron testimonio por la corporación arrendataria. De las declaraciones de ambos testigos surge que la arrendataria había otorgado un contrato de subarrendamiento con el Dr. Estarella a fines de noviembre o principios de diciembre del año 1974; pero ciertamente antes de la fecha en que la arrendataria requiriera inicialmente de los dueños el permiso para el subarriendo. Tal actuación queda corroborada al demostrarse que al 31 de diciembre de 1974 el subarrendador ya había pagado el 50% de los cánones del subarrendamiento, o sea la suma de $7,500 que constituían el pago anticipado del período de seis meses que comenzaba el 31 de diciembre de 1974 y terminaba el 30 de junio de 1975, cuyo cheque fue cobrado el 15 de enero de 1975, cuando ni siquiera la arrendataria había recibido contestación de los dueños sobre su solicitud para subarrendar.

Las consecuencias de ese incumplimiento estaban ya previstas por los dueños y la arrendataria en el contrato de subarrendamiento: en la cláusula décimotercera habían acordado que el contrato se consideraría vencido, a opción de los dueños, en caso de que la corporación arrendataria dejase de cumplir las cláusulas o condiciones del mismo. La disposición contractual está reforzada por el precepto del Código Civil que reconoce que "[L]a facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliese con lo que le incumbe." 31 L.P.R.A. sec. 3052. En su consecuencia el arrendatario que, en violación de lo pactado, procede a subarrendar sin permiso del dueño, falta al cumplimiento de una condición fundamental del pacto y permite al dueño resolver el contrato de arrendamiento. *Campos* v. *Tribl. Superior*, 75 D.P.R. 370, 375 (1953). Manresa, *Comentarios al Código Civil Español*, Tomo 10, Vol. II, pág. 97, ed. 1969. Al resolver el tribunal

de instancia conforme al principio expuesto precedentemente, no cometió error.

## II

Independientemente de que la resolución del contrato de arrendamiento encuentra apoyo en la ley, los dueños deben prevalecer bajo la doctrina expuesta en nuestra reciente decisión en *E. J. Sportswear, Inc.* v. *Sucn. Martell,* 103 D.P.R. 410 (1975).

■ Señala la arrendataria en su alegato que invirtió en las fincas arrendadas una cantidad superior a $70,000 en concepto de mejoras. Esta alegación de haber sido probada podría ser un factor para determinar la razonabilidad o irrazonabilidad de la denegatoria del dueño para subarrendar. Es preciso pues, examinar lo que aconteció ante el Tribunal Superior en relación con el planteamiento de las mejoras que pudo haber efectuado la arrendataria en las fincas arrendadas.

Es conveniente señalar que el contrato de arrendamiento contiene una cláusula—la número Seis—con respecto a las mejoras que lee así:

"Todas las mejoras efectuadas por la ARRENDATARIA en las fincas dentro del período original del contrato, como en su prórroga, quedarán a beneficio de los DUEÑOS al terminar el contrato o su prórroga, sin que los DUEÑOS vengan obligados a indemnizar por las mismas ni a la ARRENDATARIA ni a ningún tercero."

Demás está decir que habiéndose resuelto el contrato de arrendamiento, según hemos expuesto en la primera parte de esta opinión, las mejoras quedan a beneficio de los dueños, por operación de los propios términos del contrato, por lo que pierde validez el concepto de enriquecimiento sin causa.

Veamos cómo y cuándo surge la mención tardía de la arrendataria en relación con la inversión que alega haber hecho, en las fincas arrendadas. Es significativo que desde el

comienzo de la acción con la presentación de la demanda sobre sentencia declaratoria, la arrendataria no hace alegación alguna sobre mejoras a las fincas arrendadas. Su tesis se contrae a sostener que los dueños, en su primera comunicación, se negaron a conceder autorización para subarrendar por estimar que les era perjudicial a su interés de vender las fincas; y que en una segunda carta, diecinueve días más tarde, los dueños añadieron como fundamento adicional a su perjuicio de consentir al subarrendamiento, que éste no les era económicamente conveniente. La demanda está pues predicada sobre la irrazonabilidad de los dueños a acceder al subarrendamiento. Para sostener su posición la arrendataria se basa exclusivamente en el argumento de que "la alegación actual en el sentido de que el negocio no resultaba ser, alegadamente tan económicamente bueno para la parte demandada, tampoco es fundamento para querer rescindir el mismo, o para una negativa razonable al subarrendamiento." En otras palabras, la arrendataria no pretendía sostener que ella tenía razones que en el balance fueren de mayor peso para exigir el permiso de subarrendar que las razones que aducían los dueños para no consentir.

Debe resaltarse que a la fecha en que la arrendataria considera el subarrendamiento el canon de arrendamiento anual fijado por el contrato era de $5,250.00 y las contribuciones territoriales ya habían subido de $1,064.30 a $2,512.32. Según el contrato los dueños pagaban las contribuciones. De suerte que el canon real por las 298 cuerdas de terreno se reducía a la suma de $2,736.78, lo que evidentemente resultaba en perjuicio para los dueños. Resulta aún más patente lo oneroso que la relación se tornaba para los dueños, el hecho de que la arrendataria habría de recibir del subarrendatario anualidades brutas de $15,000, que se reducían, luego de deducir las contribuciones y el canon perteneciente a los dueños, a la suma neta de $9,750.00. Esto es, de permitirse el subarrendamiento se daría la situación, a todas luces carente de

equidad, de que los dueños recibirían $2,736.78 netos por concepto de cánones anuales (sin considerar futuros aumentos en contribuciones), mientras que la arrendataria recibiría $9,750.00.

■ Los hechos relatados permiten distinguir la situación en el caso de autos de la que existía en el caso de *E. J. Sportswear, Inc.* v. *Sucn. Martell,* supra, en el que reconocimos la existencia de la teoría relativista de interpretación(¹) *vis a vis* la absolutista, que subordina el derecho del arrendador a razones justificables que de no ser aceptables para la arrendataria dan lugar a la intervención de los tribunales para que sean éstos los que determinen su razonabilidad.

Aunque el contrato proveía un aumento en el canon que regiría durante el segundo término de cinco años surge que la diferencia en el canon no afectaría sustancialmente la posición onerosa de los arrendadores.

El caso de *Sportswear* resuelve una situación de equidad en que el arrendatario primitivo, por razones económicas se vio forzado a abandonar el local arrendado, sin que la arrendadora estuviese dispuesta a liberarle de sus obligaciones bajo el contrato. La actitud irrazonable de la arrendadora al negarle la autorización para subarrendar se evidenciaba en su insistencia de negociar un nuevo término, un canon más alto y otras condiciones del contrato, lo que resultaba en "una violación del contrato entre las partes y una deformación de la figura del subarriendo bajo nuestro ordenamiento jurídico." Entendimos en aquel caso que la conducta de la arrendadora rebasaba los límites de la razonabilidad "aun desde puntos de vista ya trascendidos sobre los derechos que asisten

_____

(¹)Como cuestión de hecho las partes ya habían adoptado la teoría relativista en el contrato de arrendamiento al expresar que el consentimiento del arrendador para subarrendar no se negaría irrazonablemente. La teoría relativista surge al interpretar la cláusula usual que prohíbe el subarrendamiento sin el consentimiento o agrado del arrendador. La doctrina civilista española y francesa al imponer la relatividad ha exigido que no puede negarse el consentimiento o agrado caprichosamente.

a los arrendadores en circunstancias análogas." Allí la arrendataria sometió un subarrendatario, se encontró con la resistencia ya señalada de la arrendadora; luego sometió otro subarrendatario, con el mismo resultado infructuoso y finalmente otro con el que la arrendadora logró concertar un contrato por un nuevo término, y un canon más alto. Considerando que la arrendadora había sido arbitraria al negar el subarrendamiento la obligamos a devolver a la arrendataria los cánones satisfechos durante el tiempo que duró su actitud intransigente.

■ El caso de autos se distingue en sus hechos de *Sportswear*. En éste, no solamente existen razones que justifican negar el subarrendamiento, sino que los dueños relevan a la arrendataria primitiva de sus obligaciones bajo el contrato. La arrendataria, por su parte no adujo hechos en su demanda que contravinieren los argumentos justificantes que ofrecieron los dueños para negar el subarrendamiento ni que demostraren la irrazonabilidad o temeridad de los dueños al negarlo. Se limitó a alegar que los dueños le negaron irrazonablemente la autorización del subarriendo. Ello, sin más, no es suficiente para que, invocando la teoría relativista que expusimos en *Sportswear*, proceda el tribunal a autorizar el subarriendo.

■ Como bien señala Manresa, consideraciones de equidad son las que, en sustancia, fundamentan la posición relativista. Manresa, J. *Comentarios al Código Civil Español*, Tomo X, Vol. II, pág. 94, ed. 1969. No se trata pues de atender exclusivamente a las pretensiones del arrendatario. Para poder alcanzar una solución justiciera y equitativa forzoso es sopesar los perjuicios que sufrirán *ambas partes* de obligarles a continuar la relación arrendaticia.

Es indudable que una inversión cuantiosa hecha por la arrendataria en mejoras a la propiedad arrendada con el consentimiento del dueño o inducido por el dueño a creer que

no habría inconveniente de su parte a autorizar un subarrendamiento, es un factor importante a considerar para la determinación de la razonabilidad o irrazonabilidad del dueño en su negativa al subarriendo. En el caso de autos no hay prueba de ello. De haberla habido los tribunales deben sopesarla con las razones que pudiere tener el dueño para negarse al subarrendamiento, pues es función de los tribunales considerar los intereses de todas las partes según lo requiera la justicia sustancial.

Reiteramos que la arrendataria no alegó en la demanda que la negativa al subarriendo le acarreara perjuicio alguno sino que descansó en la irrazonabilidad de las razones aducidas por los dueños. No se invocaba perjuicio alguno por mejoras realizadas. No tenía pues elementos de juicio el tribunal para sopesar los perjuicios de una y otra parte, sino solamente los aducidos por los dueños. Es sabido que aunque la arrendataria no hubiere alegado los perjuicios que militaban a su favor podía ofrecer prueba sobre ellos, conformando así las alegaciones a la prueba. Regla 13.2 de Procedimiento Civil, 32 L.P.R.A. Ap. II. Pero al no ofrecer prueba sobre esos extremos el caso quedaba huérfano de evidencia que pudiere tender a demostrar los perjuicios sufridos por la arrendataria que pudieren ser contrapesados a los de los dueños en la determinación de la razonabilidad de las razones aducidas por ambas partes conforme lo exige la teoría relativista de interpretación.

Más aún, al replicar la arrendataria a una reconvención presentada por los dueños solicitando la resolución del contrato de arrendamiento, aquélla trató de justificar el canon más alto que había cobrado al subarrendatario y con gran imprecisión y vaguedad alegó que ello era para "recobrar en parte la inversión que la parte demandante hizo en la finca arrendada." Esa expresión no quedó relacionada con la irrazonabilidad de los dueños ni se presentó prueba para sustentarla.

La sentencia del tribunal de instancia de 9 de marzo de 1978 que decretó la resolución del contrato de arrendamiento no mencionó inversión alguna de la arrendataria por concepto de mejoras en la finca. La arrendataria no solicitó reconsideración de dicha sentencia. Sin embargo, los dueños, amparados en la Regla 49.1 de las de Procedimiento Civil, solicitaron corrección de la sentencia a los únicos efectos de disponer sobre la fecha en que debía iniciarse el pago de intereses. El tribunal dictó sentencia *nunc pro tunc* aclarando lo solicitado por los dueños. De esta sentencia solicitó reconsideración la arrendataria para que se aclarara además una diferencia con respecto a las sumas que fueron pagadas a ambas partes. Se señaló una vista para ello y en su consecuencia se enmendó nuevamente la sentencia en 23 de mayo de 1978 reduciendo la suma que habría de pagar la arrendataria a los dueños. Según se desprende de una moción de la arrendataria de 31 de mayo titulada "Moción Solicitando Conclusiones de Hechos Adicionales" fue en esa vista de 23 de mayo que un testigo de nombre García Villamil declaró "sobre los préstamos que había tomado la parte demandante y las mejoras que se había [*sic*] hecho en la finca por valor de $71,400.00." Solicitaba por tanto la arrendataria al tribunal de instancia que concluyera "como cuestión de hecho y de derecho que durante el contrato original de arrendamiento la parte demandante invirtió la suma de $71,400.00 en mejoras a la finca de la parte demandada." Todo esto, en el contexto de sus alegaciones respecto a la diferencia en dinero que el tribunal ordenó a la arrendataria pagar a los dueños, equivalente a la diferencia existente entre los cánones recibidos por la arrendataria del subarrendatario y los cánones pagados por el arrendatario a los dueños conforme al contrato, ascendente esa discrepancia a la suma de $29,194.88 en la sentencia original, que al aclararse se redujo a $26,559.88 más intereses.

Al recurrir ante nos la arrendataria en solicitud de revisión de sentencia, no ataca la razonabilidad o irrazonabilidad de la negativa al subarrendamiento a base de mejoras que hubiese efectuado en las fincas. Su argumento sobre las mejoras que según alega efectuó, es utilizado para impugnar la condena que le ordenaba satisfacer a los dueños la diferencia entre los cánones que cobró al subarrendatario y los que venía obligado a pagar bajo el contrato. En otras palabras, sostiene que no viene obligada a pagar diferencia alguna a los dueños por razón de que el canon más alto cobrado al subarrendatario se justificaba por ciertas inversiones en las fincas.

Pero la arrendataria no nos puso en condiciones de evaluar esa prueba al presentar su recurso de revisión. La Regla 18 del Reglamento de este Tribunal requiere que la parte que interese acompañar una copia total o parcial de la transcripción de evidencia, debe, en moción separada, comprobar la necesidad de ello, con vista a las determinaciones de hechos del tribunal de instancia, mediante referencia a las cuesiones planteadas en la solicitud de revisión y al contenido de los testimonios específicos que intenta utilizar.

Tampoco lo pide ahora la arrendataria al solicitar reconsideración de nuestra negativa a expedir el auto de revisión. Su moción de reconsideración descansa sobre la determinación del tribunal de instancia que le obliga a pagar a los dueños la suma de $26,559.88 que recibió del subarrendatario en exceso de los cánones de arrendamiento fijados en el contrato original. Entiende la arrendataria que el pago de esa diferencia beneficia a los dueños y perjudica a la arrendataria por constituir un enriquecimiento sin causa de los primeros.

Los hechos particulares de este caso nos convencen de que las actuaciones de la arrendataria al subarrendar sin siquiera esperar a la autorización de los dueños constituyen

una violación sustancial a los términos del contrato que justifican la resolución decretada por el tribunal de instancia. Es sabido que ni el Derecho ni los tribunales de justicia existen para facilitar o permitir a los contratantes evadir el cumplimiento de sus obligaciones. *Matricardi v. Peñagarícano, Admor.*, 94 D.P.R. 1, 4 (1967). Y, si no fuera suficiente el razonamiento expuesto precedentemente para sostener la sentencia que resuelve el contrato dictada por el tribunal de instancia, estamos convencidos de que las razones aducidas por los dueños para negar la autorización para subarrendar, según se expresan anteriormente, constituyen la justificación razonable que requiere el contrato entre los dueños y la arrendataria.

*Por las razones expuestas, al amparo de la Regla 50 del Reglamento de este Tribunal, se expedirá el auto y se confirmará la sentencia del tribunal de instancia que resolvió el contrato de arrendamiento entre las partes, y ordenó el rembolso a los dueños de la diferencia entre los cánones recibidos por la arrendataria del subarrendatario y lo pagado por la arrendataria a los dueños, así como las sumas que están consignadas en el tribunal pertenecientes a los dueños, además de confirmar los demás pronunciamientos de dicho tribunal. Y, considerando que la revisión se da contra la sentencia y no contra los fundamentos de la opinión emitida en apoyo de la misma, se confirmará por el fundamento adicional de que las razones aducidas por los dueños para negar el subarrendamiento son válidas y razonables. Semanaz v. Sec. de Hacienda, 76 D.P.R. 411, 413 (1954).*

El Juez Asociado Señor Rigau se une a la opinión del Tribunal y emite opinión concurrente separada. El Juez Asociado Señor Irizarry Yunqué emitió opinión disidente a la que se unen el Juez Presidente, Señor Trías Monge, y el Juez Asociado Señor Dávila. El Juez Asociado Señor Díaz Cruz no intervino.

—0—

Opinión concurrente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 9 de febrero de 1979

Los recurridos cedieron en arrendamiento mediante escritura pública varias fincas al recurrente arrendatario [sic]. Se pactó un plazo de cinco años con derecho a prórroga por cinco años adicionales, a elección de los arrendatarios [sic], y también se pactó que los arrendatarios no podrían subarrendar ni ceder el contrato total o parcialmente sin la autorización escrita de los dueños de las fincas, cuya autorización no sería negada irrazonablemente.

Próximo a vencer el primer plazo de cinco años los arrendatarios comunicaron a los arrendadores su deseo de prorrogar el arrendamiento pero también solicitaron permiso para subarrendar las fincas.

Los arrendadores aceptaron la prórroga, a lo cual tenían derecho los arrendatarios, pero hicieron constar por escrito que no consentían al subarrendamiento "ya que la prórroga en sí del contrato por cinco años nos es perjudicial a nuestro interés de vender las fincas."

Reconocieron que los arrendatarios, a tenor con el contrato, tenían derecho a la prórroga solicitada.

No creo que actuaron irrazonablemente los arrendadores. Observaron escrupulosamente el contrato pactado, aceptando la prórroga aunque ésta les era perjudicial. Como se sabe, las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse a tenor de los mismos. Art. 1044, Código Civil, 31 L.P.R.A. sec. 2994. *Clausells* v. *Salas*, 51 D.P.R. 89 (1937). Ni el Derecho ni los Tribunales de Justicia existen para facilitar o permitir a los contratantes evadir el cumplimiento de sus obligaciones. *Matricardi* v. *Peñagarícano, Admor.*, 94 D.P.R. 1 (1967).

Los dueños arrendadores interesaban vender. La opción obligada de la prórroga ya les era perjudicial pero tienen que

aceptarlo por haberlo así pactado. Pero no venían obligados a aceptar una condición onerosa más—el subarriendo de sus fincas por el arrendatario—pues a ello no venían obligados por el contrato, sino que por el contrario se habían reservado la facultad de denegarlo. En vista de que el subarriendo les era perjudicial fue razonable su decisión de no aceptarlo.

Si los términos del contrato eran buenos para los arrendatarios para imponer la prórroga forzosa también deben ser buenos para el arrendador negarse al subarriendo perjudicial, según lo pactado. No pueden los arrendatarios escoger unas cláusulas del contrato y rechazar o hacer caso omiso de otras. Creo que los arrendadores actuaron razonablemente. Si los contratos escritos pueden luego ser desechados por consideraciones subjetivas casi imperceptibles ¿para qué sirven? Si esa fuera la ley y no la que establece el Código Civil ¿qué quedaría del derecho de propiedad? Peor aún, ¿cómo podría continuar con razonable certeza y seguridad la actividad comercial y agrícola?

Por entender que los arrendadores actuaron dentro de ley, dentro de los términos del contrato y de buena fe, entiendo que la sentencia recurrida debe ser confirmada. *Pacta sunt servanda.*

—O—

Opinión disidente emitida por el Juez Asociado Señor Irizarry Yunqué, a la que se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 7 de febrero de 1979

En *E. J. Sportswear, Inc.* v. *Sucn. Martell,* 103 D.P.R. 410 (1975), adoptamos la teoría o principio relativista respecto al derecho del arrendatario a subarrendar la propiedad arrendada. Este principio niega al arrendador la potestad de rehusar arbitrariamente el consentimiento para el subarrendamiento, potestad que subordina a razones justiciables a juicio de los tribunales. Igual que en dicho caso, en el que

ahora consideramos se trata de un contrato de arrendamiento en que, independientemente de la aplicabilidad del principio relativista como derecho supletorio, las partes expresamente lo adoptaron al convenir que, aunque la arrendataria no podría subarrendar sin el consentimiento expreso de los arrendadores, éstos no podrían negar dicho consentimiento irrazonablemente. En este caso la arrendataria solicitó de los arrendadores su consentimiento para subarrendar y subarrendó sin haber recibido el consentimiento solicitado, que le fue denegado. ¿Impedía ello que judicialmente se examinara y decidiera si la denegatoria fue irrazonable? ¿Lo fue en este caso? ¿Tenían derecho los arrendadores a la resolución del contrato? Tales son las interrogantes que se nos plantean. Para contestarlas, precisa examinar los hechos con detenimiento.

Doña Rosario Mattei viuda de Castañer y sus hijos Jaime Luis, Alberto y María Irma Castañer son dueños de dos fincas radicadas en el barrio Esperanza de Arecibo, con cabidas que suman 297.98 cuerdas. Doña María Irma Castañer y su esposo don Francisco Antonio Delgado son a su vez dueños de una finca de 42.36 cuerdas que también radica en el mencionado barrio Esperanza. Mediante escritura pública otorgada en agosto de 1970 estos señores cedieron las tres fincas en arrendamiento a Ganadería Esperanza, Inc., para ser dedicadas como un solo fundo al negocio de ganadería. Se pactaron, entre otras condiciones: un plazo de cinco años a partir del primero de julio de 1970, prorrogable por cinco años adicionales a opción de la arrendataria, previa notificación escrita de tal intención por lo menos sesenta días antes de vencer el plazo original; un canon de arrendamiento por las tres fincas de $4,000.00 al año por los primeros dos años, $5,250 por año por los siguientes tres años, y este mismo canon anual en caso de acogerse la arrendataria a la prórroga, actualizado cada año al poder adquisitivo que el dólar tuviese; los arrendadores pagarían las contribuciones terri-

toriales; y, las mejoras que efectuare la arrendataria quedarían a beneficio de los arrendadores sin obligación de indemnizar por ello. La cláusula número diez dispuso:

"La corporación ARRENDATARIA no podrá subarrendar ni ceder este contrato parcial o totalmente sin la autorización expresa y por escrito de los DUEÑOS, cuya autorización no será negada irrazonablemente, y seguirá siendo responsable del pago de cánones y demás obligaciones de este contrato."

Por la cláusula trece se dispuso que el contrato "se considerará vencido, a opción de los DUEÑOS, en caso de que la Corporación ARRENDATARIA dejare de cumplir cualquiera de los términos, cláusulas o condiciones del mismo."

El 7 de diciembre de 1974 el presidente de la corporación arrendataria remitió por correo la siguiente carta a don Jaime Luis Castañer, representante de los arrendadores, a su dirección en Yauco, conforme se dispuso en la cláusula número catorce de la escritura:

"Estimado Jaime Luis:

Confirmo nuestra conversación telefónica de hace unos días en relación al contrato de arrendamiento que Ganadería Esperanza, Inc. tiene con esa Sucesión.

Interesamos de Uds. autorización para subarrendar esta finca por el término de la vigencia de nuestro contrato y su prórroga. Nosotros seguiremos siendo responsable [*sic*] del pago de cánones y demás obligaciones de este contrato.

Aprovecho para informarles que a partir de julio 1, 1975, es nuestro deseo prorrogar el contrato vigente por cinco años adicionales.

En espera de su contestación, quedo,

Atentamente
Dr. Julio A. Santos
Presidente"

Se desprende de esta carta que el propósito de la arrendataria de hacer uso de su derecho a prorrogar el contrato y de subarrendar las fincas no le eran desconocidos a los arrendadores. De hecho, ya había un subarrendatario potencial, Dr.

Antonio Estarella Román, bajo condiciones aparentemente ventajosas para la arrendataria. Transcurrió todo el mes de diciembre sin que los arrendadores contestaran a la arrendataria. Ya para fines del mes se habían materializado los acuerdos de subarrendamiento a base de un canon de $15,000.00 al año, pues con fecha de 31 de diciembre el Dr. Estarella había expedido cheque a favor de la arrendataria por $7,500.00 en pago de los primeros seis meses. La arrendataria esperó al 15 de enero de 1975 para cobrar el cheque.

Así las cosas, con fecha de 17 de enero de 1975—cuarenta y un días después de serles enviada la transcrita carta—los arrendadores contestaron. Reconocieron el derecho de la arrendataria a la prórroga de cinco años adicionales, pero negaron el consentimiento para subarrendar, dando la siguiente razón: "Sobre este particular, sentimos informarles que no estamos inclinados a permitir el sub-arriendo [sic] de las fincas ya que la prórroga en sí del contrato por cinco años más nos es perjudicial a nuestro interés de vender dichas fincas."

A esta comunicación contestó la arrendataria cuestionando la razonabilidad del fundamento dado por los arrendadores. "A la verdad," expresaron, "que no comprendemos la razón de la negativa de ustedes." Señalaron que, teniendo derecho a la prórroga de cinco años, no hallaban diferencia alguna para los arrendadores "el que sea Ganadería Esperanza, Inc., el que continúe esos cinco años, o que sea otra persona quien atendería la finca igual o mejor que nosotros y cuya solvencia económica es buena, además del hecho de que siempre nosotros seguiríamos respondiendo del pago del canon y demás obligaciones." Terminó su carta la arrendataria solicitando de los arrendadores que reconsideraran "su actitud que no encaja en el sentido que siempre se le ha dado a la frase 'cuya autorización no será negada irrazonablemente'."

En contestación a esta comunicación, los arrendadores escribieron a la arrendataria dando como razón adicional

para negarse a consentir al subarrendamiento, el "alza considerable que se produjo este año en las contribuciones sobre la propiedad." Señalaron que "en el año 1973–74 el importe total de las contribuciones de las tres fincas fue de $1,064.30" y que para el año 1974–75 "el importe ascendió a $2,515.32," un aumento de $1,451.02. Insistieron que a base de ello "la prórroga del contrato por cinco años adicionales no es razonable para nosotros," pero reconocieron el derecho de la arrendataria a dicha prórroga. Expresaron finalmente: "Ahora, el permitir un subarriendo a terceras personas no es obligatorio y podemos, como de hecho lo hacemos, negarnos a aceptarlo por las razones antes expuestas."

A esta carta siguió otra de los arrendadores en que expresaron haberse enterado de que la arrendataria había subarrendado, dieron "por vencido" el contrato, y requirieron la entrega de las fincas al vencer el contrato original, que sería el 30 de junio de 1975. En otras palabras, la resolución no sería inmediata. El contrato seguiría en efecto hasta su vencimiento. Lo que quedaba afectado era el derecho a prórroga de la arrendataria.

La arrendataria recurrió al Tribunal Superior, Sala de Arecibo, mediante demanda de sentencia declaratoria que acompañó de copias de la escritura de arrendamiento y las cartas cursadas entre las partes, que hemos reseñado. Invocó la cláusula diez del contrato antes transcrita y solicitó que se declarase irrazonable la negativa a subarrendar. Los arrendadores se opusieron a la demanda y mediante reconvención solicitaron la "rescisión" del contrato de arrendamiento y reclamaron $10,000 en concepto de daños y perjuicios. Luego de numerosos incidentes, el Tribunal Superior dictó sentencia el 9 de marzo de 1978 en que declaró sin lugar la demanda sobre sentencia declaratoria, declaró con lugar la reconvención y ordenó a la arrendataria devolver las fincas y pagar a los arrendadores $24,309.88—diferencia entre los cánones pagados por Ganadería y lo que ésta recibió del suba-

rrendatario desde el primero de enero de 1975—más intereses al seis por ciento anual desde esa fecha, costas, y $1,000.00 de honorarios de abogado. La arrendataria ha recurrido.[1]

La sentencia del tribunal de instancia, aunque extensa en la exposición de las alegaciones de las partes y trámites del caso y extensa también en sus conclusiones de Derecho dadas las numerosas citas que hace, recoge sus determinaciones de hechos en poco más de tres páginas, limitándose al aspecto del subarrendamiento sin consentimiento. No hizo determinación alguna el tribunal, de hecho ni de Derecho, sobre la razonabilidad de la negativa.

Ciertamente, bajo la cláusula diez del contrato la arrendataria no podía subarrendar sin la autorización expresa de los arrendadores, y la número trece daba derecho a éstos a considerarlo "vencido" si la arrendataria incumplía sus términos. Empero, el contrato debe ser interpretado como un todo y no a base de cláusulas o condiciones aisladas. La condición impuesta a los arrendadores de no negar irrazonablemente el consentimiento para subarrendar es parte importante del contrato, y su interpretación no podía dejarse al arbitrio exclusivo de los arrendadores.

El Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052, dispone:

"Sec. 3052. Derecho de resolver obligaciones recíprocas

La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.

El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y

---

[1] El 3 de agosto de 1978 este Tribunal, por resolución de una de sus Salas, se negó a expedir el auto de revisión solicitado por Ganadería Esperanza, Inc. Oportunamente la recurrente solicitó reconsideración. Ambas partes han presentado ante nos alegatos en apoyo de sus respectivas posiciones, estando nosotros en posición de resolver sin más trámites, conforme lo autoriza la Regla 50 de nuestro Reglamento.

abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.

El tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo.

Esto se entiende sin perjuicio de los derechos de terceros adquirentes, con arreglo a las secs. 3496 y 3499 de este título, y las disposiciones de la Ley Hipotecaria, Título 30."

Su tercer párrafo es significativo pues implica la necesidad de que la resolución sea decretada por un tribunal, cuando menos si hay, como aquí, una controversia justiciable. Guaroa Velázquez—*Las Obligaciones Según el Derecho Puertorriqueño*, ed. Equity 1964, págs. 78 y 79—señala que se requieren dos condiciones para que una parte pueda obtener la resolución del contrato mediante la aplicación de este artículo, a saber, (1) La inejecución de la obligación por la otra parte, y (2) el pronunciamiento de un tribunal. [2] Véase, al mismo efecto, Scaevola, *Código Civil*, Tomo XIX. Esto es particularmente así cuando se trata, como aquí, de un contrato de arrendamiento, en vista del Art. 1446, 31 L.P.R.A. sec. 4053, que dispone:

---

[2] Si bien en *Federal Land Bank* v. *Echeandía*, 48 D.P.R. 320 (1935), sostuvo este Tribunal que un contrato en que hay obligaciones recíprocas no tiene necesariamente que acudirse a un tribunal para su resolución, dicha decisión ha sido objeto de severa crítica. Véase Guaroa Velázquez, *op. cit.*, supra, pág. 79. Cabe señalar, además, que en dicho caso se trataba de un contrato de compraventa en que "fue convenido expresamente entre las partes contratantes que si el comprador dejare de pagar alguno de los plazos estipulados el vendedor tendría derecho a rescindir el contrato, comprometiéndose el comprador a entregarle la finca que se le vendió" (pág. 323 de la opinión), hecho este que enfatizó este Tribunal como fundamento importante. Otro hecho particularmente decisivo es que no había controversia entre las partes en cuanto al derecho del vendedor a resolver el contrato. El caso se inició mediante demanda de desahucio instada por el vendedor contra el comprador al no haber satisfecho éste el precio pactado. El comprador demandado no compareció al tribunal de instancia y al negarse dicho tribunal a dictar sentencia en rebeldía, recurrió el vendedor en alzada ante este Tribunal. El comprador demandado tampoco compareció aquí para oponerse al recurso. La resolución del contrato operó de pleno derecho y bajo las circunstancias se hacía innecesario que la decretase un tribunal.

"Sec. 4053. Rescisión del contrato: indemnización

Si el arrendador o el arrendatario no cumplieren las obligaciones expresadas en las secciones anteriores, podrán pedir la rescisión del contrato y la indemnización de daños y perjuicios, o sólo esto último, dejando el contrato subsistente."[3]

Para resumir este primer punto, la cláusula trece del contrato de arrendamiento no podía dar potestad exclusiva a los arrendadores para resolver el contrato en vista de la condición impuesta a éstos de no negar irrazonablemente el consentimiento para subarrendar. Esa condición hizo surgir la controversia entre las partes. Fue el motivo de que la arrendataria solicitara sentencia sumaria a su favor. El tribunal a quo debió pasar sobre ello. Resolver lo contrario equivaldría a dar una interpretación sumamente restrictiva al Art. 1077 del Código Civil y dar a la cláusula trece del contrato el valor de *lex commissoria*, aplicable únicamente a los contratos de compraventa.[4] En justicia no se puede legitimar el abuso del derecho de resolución de los contratos.

La segunda interrogante planteada al principio de esta opinión obliga a examinar la razonabilidad de la negativa de los arrendadores a consentir el subarrendamiento. Las únicas razones dadas por ellos fueron (1) que "la prórroga en sí del contrato por cinco años más nos es perjudicial a

---

[3] Las obligaciones a que se refieren "las secciones anteriores" que dice dicho artículo son las reconocidas al arrendador y al arrendatario en los Arts. 1444 y 1445 del Código, 31 L.P.R.A. secs. 4051 y 4052, respectivamente.

[4] Sobre el particular dice Guaroa Veláquez, *op. cit.*, pág. 76-77:

"El derecho de pedir la resolución del contrato por causa de inejecución no existía en Derecho romano. De donde resultaba que el vendedor que hubiera concedido un término a su comprador no podía reclamarle la restitución de su cosa, hallándose así expuesto a su insolvencia. Para evitar esta contingencia, se introdujo la práctica de insertar en los contratos de venta una cláusula, llamada *lex commissoria*, que daba al vendedor el derecho, en caso de que el comprador no pagase el precio en el término convenido, de resolver el contrato. Gracias a esta cláusula, el vendedor podía hacerse restituir su cosa sin necesidad de recurrir a la justicia para que pronunciara la resolución porque ésta tenía lugar de pleno derecho a diferencia de lo que sucede hoy. De este modo, la práctica colmó la laguna de la ley, pero sólo en materia de venta y en interés del vendedor."

nuestro interés de vender las fincas" (contestación a la solicitud del consentimiento), y (2) que debido al "alza considerable que se produjo este año en las contribuciones sobre la propiedad" hacía que "la prórroga del contrato por cinco años adicionales no es razonable para nosotros" (contestación a carta de la arrendataria en que solicitó la reconsideración de la denegatoria). Como puede verse, las dos razones son aplicables únicamente a la conveniencia para los arrendadores de consentir a la prórroga del contrato, y a eso ellos mismos reconocieron que no podían negarse.

Hay una tercera razón no invocada expresamente pero latente en la actitud de los arrendadores, y a la que se da gran importancia en la decisión de este Tribunal. Se señala que, habiéndose pactado un canon que en la fecha de la controversia era de $5,250.00 anuales, Ganadería Esperanza obtendría con el subarrendamiento un canon de $15,000.00 anuales, casi el triple del que venía obligada a pagar a los arrendadores.

Esto no es exactamente correcto. Al hacer uso de su derecho a prorrogar el contrato por cinco años la arrendataria venía obligada a pagar a los arrendadores, por cada año de prórroga, una cantidad superior a $5,250.00, pues conforme al contrato había que actualizar dicha suma al valor adquisitivo del dólar, a cuyo fin se pactó (cláusula cuarta) que "[para] determinar el poder adquisitivo del dólar se utilizarán las cifras oficiales publicadas por el Departamento del Trabajo Federal." Obra en autos una tabla de dicho Departamento que refleja, tomando el año 1967 como base comparativa que para julio de 1975, primer mes de la prórroga a que tenía derecho Ganadería Esperanza, el dólar había depreciado a 61.6 centavos. En julio de 1970, cuando se inició la relación arrendaticia, el dólar tenía un valor, según dicha tabla, de 85.7 centavos. Ello significa que cinco años después valía 24.1 centavos menos que al iniciarse la relación. Ciertamente, conforme a la cláusula transcrita, que obliga a actua-

lizar el canon pactado a base del valor adquisitivo del dólar por cada año de la prórroga, Ganadería Esperanza vendría obligada a pagar más de $5,250.00 por año. Debe tenerse en cuenta que el valor del dólar ha continuado en descenso en los últimos años a un ritmo mucho más acelerado que el que hubo en el lustro que duró el término inicial del contrato de arrendamiento.

Hay otras circunstancias que obligan a cuestionar la razonabilidad de la negativa de los arrendadores. Alega la recurrente que en los cuatro años y medio iniciales del contrato invirtió $71,400 en mejoras a las fincas, prueba que aportó ante el tribunal de instancia y que éste se negó a considerar. Sin embargo, el tribunal a quo dio particular énfasis al hecho de que se pactara un canon de subarrendamiento de $15,000 anuales. No puede pasarse por alto, pues resulta chocante, que unas fincas que totalizan 339 cuerdas fueran cedidas en arrendamiento por un canon inicial equivalente a $2,935.70 por año ($4,000.00, canon pactado por los primeros dos años, menos $1,064.30, contribuciones territoriales por año), es decir $244.64 por mes, y que alguien esté dispuesto a pagar un canon, cinco años después, de $15,000 por año. Ello sugiere, o que los arrendadores hicieron un pésimo negocio al arrendar, o que la condición de las fincas no ameritaba un canon mayor del pactado en 1970, y que se han hecho en ellas mejoras que cinco años después ameritan un canon de $15,000.00. Si esto es así, no sería justo aplicar sin más la disposición en virtud de la cual los arrendadores pretenden la resolución del contrato. Se beneficiarían los arrendadores de la inversión de $71,400.00 alegada por la arrendataria—que es tres veces mayor que los cánones pagados por ella durante los cinco años—aparte de recibir las fincas en condiciones de ser arrendadas por $15,000.00 al año, más $24,309.88 e intereses sobre dicha cantidad, y $1,000 de honorarios de abogado que la sentencia recurrida condena a Gana-

dería Esperanza a pagar. (⁵) Y todo porque Ganadería subarrendara sin autorización, negándose el tribunal a cuestionar la razonabilidad de la negativa.

Es cierto que se pactó—y que en ausencia de pacto aplicaría el Art. 1463 del Código Civil (⁶)—que las mejoras útiles en la propiedad arrendada quedan a beneficio de los arrendadores al finalizar el contrato. Esto no puede, sin embargo, aplicarse rigurosamente y con abstracción de todas las demás cuestiones planteadas en este caso. Los tribunales no estamos para aplicar la ley en abstracto. Somos tribunales de justicia, y hacer justicia debe ser el fin.

A mi juicio, en ánimo de hacer cumplida justicia a las partes en este caso, el tribunal de instancia debería pasar sobre la razonabilidad de la negativa de los arrendadores a consentir al subarrendamiento, considerando toda la prueba, incluyendo la aportada por la arrendataria respecto a su inversión de $71,400.00, y cualquier otra que las partes pudieran aportar sobre este particular. A tales efectos, revocaría la sentencia del tribunal recurrido y dispondría que éste reabra el caso y adjudique con vista de toda la prueba, si es razonable negar la autorización para subarrendar. Confirmar la sentencia como lo hace ahora este Tribunal, puede consagrar una grave injusticia que no tiene otro apoyo que el tecnicismo de que el subarrendamiento por Ganadería Esperanza, sin esperar a tener el consentimiento de los dueños de las fincas, es suficiente para justificar que los arrendadores resolvieran el contrato, e impide examinar la razona-

---

(⁵)Estas cantidades sin incluir los intereses acumulados, ascienden a $96,709.88. Un cómputo de los cánones que Ganadería debió pagar durante los cinco años de vigencia del contrato arroja un total de $23,750.00.

(⁶)31 L.P.R.A. sec. 4070, que dispone: "El arrendatario tendrá, respecto de las mejoras útiles y voluntarias, el mismo derecho que se concede al usufructuario."

El Art. 416, 31 L.P.R.A. sec. 1527, dispone, respecto al usufructuario, que "podrá hacer en los bienes objeto del usufructo las mejoras útiles o de recreo que tuviese por conveniente, con tal que no altere su forma o substancia, pero no tendrá por ello derecho a indemnización."

bilidad de su negativa. No puedo estar de acuerdo con esa forma de impartir justicia. La justicia no puede ser prisionera de los tecnicismos.